E-FILED
Tuesday, 29 March, 2022  03:47:31 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| EDWIN J. GIRE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-3079 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER AND OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Petitioner Edwin J. Gire's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (d/e 1).  Petitioner alleges he received ineffective assistance of counsel throughout his criminal proceedings, which led to his guilty plea for unlawfully employing illegal aliens and his guilty verdict after a bench trial for visa fraud and harboring illegal aliens. Petitioner also alleges the Government withheld exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  For the reasons below, the Court DENIES Petitioner's § 2255 Motion (d/e 1) and DECLINES to issue a certificate of appealability.

## I.  BACKGROUND

The criminal investigation into Petitioner's roofing business's H-2B immigration visa petitions became clear when a search warrant was executed on a building owned by Petitioner's roofing company on May 28, 2014.  Petitioner and his girlfriend, Kimberly Young, decided they needed legal counsel.  They found Andrew DeVooght and began working with him to hopefully avoid a criminal indictment.  See, e.g., Transcript (d/e 51) at 170.  Once that effort failed, DeVooght continued defending Petitioner against the criminal charges until after Petitioner pled guilty to three counts of unlawful employment of aliens and was found guilty after a bench trial on January 31, 2018 of four counts of visa fraud and three counts of harboring illegal aliens.  See United States v. Gire, 16-cr-20044-001 (C.D. Ill.) (hereinafter, "Crim."), Judgment (d/e 133).  Petitioner has now filed this § 2255 Motion, alleging DeVooght's representation and advice was constitutionally deficient in numerous regards and argues his convictions and sentence should be vacated.

### A. The I-129 Visa Petition Fraud

Petitioner has been in the roofing business for many years.  He was the owner of his company Gire Construction Inc., (d/b/a Gire

Roofing) until 2011.  Crim., Plea Transcript (d/e 69) at 21.  In 2011,

he declared bankruptcy and the company dissolved.  However, his

girlfriend, Kimberly Young, provided the start-up capital and credit

to open another company under the name Grayson Enterprises

(d/b/a Gire Roofing).  Id.; Crim., Transcript (d/e 75) at 985, (d/e

76) at 1091.  Petitioner was responsible for managing the new

company's day-to-day operations, but Young was listed as the CEO

and President.  Id.

 In March 2011, August 2011, March 2013, and April 2014,

Gire Roofing submitted H-2B visa petitions to receive temporary

workers.  The H-2B temporary worker visa program allows U.S.

employers, or their agent, who meet specific regulatory

requirements to bring foreign nationals to the United States to fill

temporary nonagricultural jobs.  Individuals or entities seeking to

hire H-2B visa workers are required by immigration laws or

regulations to submit I-129 petitions to the Department of

Homeland Security (DHS).

Petitioner submitted these petitions through attorney Saman

Movassaghi on behalf of either Gire Construction, Inc. (Gire

Construction) or Grayson Enterprises.  Attached to each of the four

I-129 petitions were numerous fabricated roofing contracts.  For example, the first I-129 petition at issue (from March 2011) sought visas for 95 workers and justified the need for these workers by claiming that Gire Construction had two valuable contracts for roofing work in Central Illinois: (1) a $1,252,000 contract for work at a mall near Tuscola, Illinois and (2) a $375,000 contract for work at a cap-and gown company in Arcola, Illinois.  See Crim., Transcript (d/e 70) 76, 83-84, 86-90; Gov.Ex. 100.  The petition and the contracts both were signed with the Petitioner's name.  These projects, however, never existed.  Crim., Transcript (d/e 72) at 374-76, (d/e 74) at 660-64, 670-73.  And, while 93 visas were issued and 93 foreign workers entered the country, the Government presented evidence that none of these workers worked for Gire Construction.  Crim., Transcript (d/e 70) at 93, (d/e 74) 791-92.

The scheme was similar for the other three petitions that were filed.  The August 2011 Petition requested an extension for the visas of 20 workers who were already in the country, but they worked for a different employer (M&M Industrial Services, which is owned by Terry Metreyeon).  Crim., Transcript (d/e 70) at 93-105, Gov. Ex.

200; Memo (d/e 2) at 11.  None of these workers ever worked for Gire Construction.

The March 2013 Petition justified the need for 43 visas by attaching multiple fabricated contracts that had been signed by Petitioner, four of which were over $100,000.  Crim., Transcript (d/e 70) at 118-19, 120-23; Gov.Ex.300.  The evidence at trial also showed that Young was aware that Petitioner was seeking workers to help with Grayson's roofing business in March 2013.  Both Young and Petitioner corresponded with Movassaghi about the March 2013 Petition, sometimes using the same Gire Roofing email address.  Crim., Transcript (d/e 72) at 413-14, 426-27, (d/e 75) at 982-84, 1009, 1011, 1051-52, 1072, (d/e 76) at 1096-1100; Gov.Ex. 302 at 149-50.  Petitioner at times gave Young supporting documents to email to Movassaghi.  Id. (d/e 76) at 1097-1100.

However, this time one of the individuals who obtained a visa as a result of the March 2013 Petition, Cresencio Garcia-Cruz, did do work for Grayson beginning in July 2013.  Crim., Transcript (d/e 73) at 553.  Garcia-Cruz continued to work for Grayson until September 2014 even though his visa expired in November 2013.  Crim., Plea Transcript (d/e 69) at 22; Crim., Transcript (d/e 70) at

127, (d/e 73) at 557.  None of the other individuals who obtained a visa as a result of the March 2013 petition performed any work for Grayson.

Finally, the April 2014 Petition justified the need for 71 visas based on more fabricated contracts, one of which was for $2.895 million.  Transcript (d/e 70) at 144-45; Gov. Ex. 400.  The trial evidence also showed that these contracts were signed by Petitioner and that Young sent them to Movassaghi via email.  Crim., Transcript (d/e 73) at 540-42, 699-703, (d/e 76) at 1123; Gov.Ex. 402 at 22-36.

For the 2011 petitions, Petitioner retained Michael Lombardi of U.S. Opportunities to help him obtain foreign workers for his visas, as well as Lombardi's associate, Kevin Daley.  Memo (d/e 2) at 7. Notably, Lombardi was convicted and sentenced for conspiracy to commit visa fraud related to another company's visa petition and was in prison during the time the 2013 and 2014 petitions were filed.  See Crim., Transcript (d/e 74) at 808.  With Lombardi in prison, Petitioner worked with Daley to obtain workers for the 2013 and 2014 visas.  The Government presented evidence that Daley had re-sold visas on the black market to foreign nationals.  See

Crim., Transcript (d/e 73) at 566. The Government also presented evidence that after the March 2011 and March 2013 I-129 petitions were submitted, Petitioner and Young received at least two payments from Kevin Daley. Crim., Transcript at 254, 302-03, 553-54, 617. Specifically, in June 2011, the petitioner received $2,000 from Daley via a wire transfer to Gire Construction's bank account. Id. at 722. In September 2013, Young received $4,000 from Daley via a wire transfer to her personal account. Id. at 269-71, 773.

Nonetheless, Petitioner has consistently maintained his innocence, claiming instead that it must have been Lombardi, Daley, and/or Movassaghi who perpetrated the fraud. At trial, Petitioner presented evidence of other businesses that had had fraudulent petitions submitted on their behalf while working with Lombardi and Movassaghi. See, e.g., Crim., Transcript (d/e 74) at 743-51 (testimony of Teri Borowski who worked for the Polo Club of Boca Raton and alleged that Lombardi charged his workers illegal fees and that his signature was forged on a visa related document). He also presented evidence at trial through Young and others that a woman working for Daley named "Fatima" was the one emailing Movassaghi fabricated paperwork for the visas in March 2013,

rather than Petitioner and/or Young.  See, e.g., Crim., Transcript (d/e 75) at 979-989.

**B. The Criminal Investigation and Proceedings**

The criminal investigation began when the Department of State discovered that workers who been granted H-2B visas to work for Gire Roofing had not actually worked for Gire Roofing.  Law enforcement executed a search warrant on May 28, 2014, that allowed them to search the Gire warehouse in Champaign, Illinois. In addition to evidence of visa fraud, this search revealed evidence that illegal aliens were working for Petitioner and being housed in this warehouse.  Crim., Plea Transcript (d/e 69) at 22-23; Crim., Transcript (d/e 73) at 555, 564, 621-22, 631-32, (d/e 74) at 724-25.  These individuals included Garcia-Cruz who entered the United States with a H-2B visa as a result of the March 2013 petition, as well as Lopez-Constantino and Torres-Hernandez, who both entered the United States without documentation.  Id.  Notably, Petitioner encouraged Torres-Hernandez to apply for an H-2B visa, but his application was denied.  Crim., Plea Transcript (d/e 69) at 23. Torres-Hernandez continued to work for Grayson after his application was denied.  Id.; Crim., Transcript (d/e 73) at 589-90.

After the search, Petitioner and Young sought legal counsel with the apparent hopes of avoiding an indictment.  See, e.g., Transcript (d/e 51) at 170.  They found DeVooght.  With DeVooght, they approached the U.S. Attorney's Office and attempted to explain how Petitioner did not have the motive to commit the crime.  They also attempted to direct the Government's investigation to the three individuals they later placed the blame on at trial: (1) Movassaghi; (2) Lombardi; and (3) Daley.  The U.S. Attorney's Office requested that Petitioner waive attorney-client privilege to allow them to speak to Movassaghi.  After being advised to do so by DeVooght, Petitioner agreed to waive attorney-client privilege.

Ultimately, Petitioner was unsuccessful at avoiding an indictment for him and his business (although Young was not indicted).  In June 2016, Petitioner was charged in a ten-count Indictment.  See Crim., Indictment (d/e 1).  Counts 1 through 4 charged Petitioner with visa fraud in violation of 18 U.S.C. §§ 1546(a) and 2.  Id.  Counts 5 through 7 charged Petitioner with harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).  Id.  Counts 8 through 10 charged Petitioner with unlawful

employment of aliens in violation of 8 U.S.C. § 1324a(a)(1)(A) and (f)(1).  Id.

On October 20, 2017, Petitioner appeared before Magistrate Judge Schanzle-Haskins and pled guilty to the misdemeanor charges of unlawful employment of aliens, Counts 8-10.  The Court accepted Petitioner's guilty pleas to Counts 8 through 10 on November 8, 2017.  Crim., Text Order, Nov. 8, 2017.

Shortly before trial, on November 7, 2017, Petitioner waived his right to a jury trial.  Crim., Text Order, Nov. 7, 2017.  The bench trial began the same day and continued until November 15, 2017. On January 31, 2018, in a written verdict, the Court found Petitioner guilty of the offenses charged in Counts 1 through 7. Crim., Verdict (d/e 61).  On February 7, 2019, Petitioner was sentenced to 36 months' imprisonment on each of Counts 1 through 7, and 2 months' imprisonment on each of Counts 8 through 10, all to run concurrently.  Crim., Judgment (d/e 133) at 3.  Petitioner was also sentenced to two years of supervised release on each of Counts 1 through 7, all to run concurrently.  Id. at 4.

## C. Section 2255 Motion and Proceedings

On March 25, 2019, Petitioner filed a Motion Under 28 U.S.C.
§ 2255 to Vacate, Set Aside, or Correct Sentence by a Person in
Federal Custody (d/e 1) and a Memorandum of Law in Support of
His § 2255 Motion to Vacate Convictions (d/e 2).  Petitioner claims
that he received ineffective assistance from his trial counsel and
that the Government failed to acquire and disclose exculpatory
evidence to Petitioner.  See Motion (d/e 1), at 4–5.  He argues that it
was DeVooght's ineffective assistance of counsel that led to his
indictment and conviction.  He continues to maintain his innocence
of all charges.  Specifically, Petitioner alleges ten grounds of
incompetent performance on the part of his counsel (which the
Court has reordered for ease of review):

(1) Advice to plead guilty to unlawful employment
based on misunderstanding of law and with no
benefit to Petitioner;

(2) Advice to waive jury trial based on same
misunderstanding of law;

(3) Failure to advise Petitioner about possible cooperation;

(4) Waiver of privilege without any firsthand
information regarding contents of communications;

(5) Failure to file meritorious motions to suppress;

(6)     Failure to retain handwriting expert to offer
        powerful exculpatory testimony;

(7)     Failure to investigate and/or interview witnesses
        who could prove Mr. Gire's innocence and failure to
        acquire other potentially exculpatory evidence;

(8)     Failure to request investigative files for key government
        witnesses and lead investigator, or to inquire into these
        subjects at trial and Government failure to acquire and
        disclose such information to the defense;

(9)     Calling Ms. Young as trial witness without sufficiently
        preparing her to testify; and

(10)    Failure to object to inadmissible evidence and improper
        argument.

Petitioner argues he was pressured and threatened by DeVooght to

waive his rights.  However, he chose to continue on with DeVooght

and follow his advice rather than assert his rights or find an

attorney with more agreeable advice, in part, due to the cost of

finding another attorney.

On November 13 and 14, 2019, a two-day evidentiary hearing

on Petitioner's § 2255 motion was held.  See Transcripts (d/e 51,

52).  Petitioner and the Government presented evidence relating to

Petitioner's ineffective assistance of counsel claims.  After the

hearing, the Government filed a response (d/e 56) and Petitioner

filed a reply (d/e 59).  The Court also notes the stipulations that have been filed on the record: d/e 39, 41, 43, 63.

While the Court has not directly ruled on the merits of the § 2255 Motion prior to this order, the Court notes that the Court's prior orders on Petitioner's Motions for Release on Bail, see d/e 19, 62, and on Petitioner's Motion for Production of Exculpatory Evidence and Discovery, see d/e 30, have already addressed the merits of most of Petitioner's claims and found them unlikely to succeed.  For ease of review, relevant portions of those orders have been incorporated within the analysis here.

## II.   LEGAL STANDARD

Section 2255, "the federal prisoner's substitute for habeas corpus," Brown v. Rios, 696 F.3d 638, 640 (7th Cir. 2012), permits a prisoner incarcerated pursuant to an Act of Congress to request that his sentence be vacated, set aside, or corrected if "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Relief under § 2555 is an extraordinary remedy

because a § 2255 petitioner has already had "an opportunity for full process." Almonacid v. United States, 476 F.3d 518, 521 (7th Cir. 2007). Accordingly, relief under § 2255 is only appropriate for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Harris v. United States, 366 F.3d 593, 594 (7th Cir. 2004) (quotation marks omitted). And, while a § 2255 Motion is not a substitute for a direct appeal or to raise arguments that could have been raised on direct appeal but were not, a "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." Massaro v. United States, 538 U.S. 500, 509 (2003).

## III.  DISCUSSION

### A. Petitioner's Stand-Alone Brady claim is Procedurally Defaulted.

Petitioner claims that the Government failed to acquire and disclose exculpatory evidence to Petitioner, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Under the Supreme Court's decision in Brady, the Government is required to "provide a defendant with

exculpatory evidence within the government's knowledge or control where the evidence is material either to guilt or to punishment." United States v. Hamilton, 107 F.3d 499, 509 (7th Cir. 1997).  In addition to being material to guilt or punishment, exculpatory evidence is favorable to the accused.  See Brady, 373 U.S. at 87. When the reliability of a witness may be determinative of guilt or innocence, nondisclosure of evidence affecting the credibility of the witness falls within the general rule imposed by Brady.  Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted).

"Evidence is material to the defense if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Hamilton, 107 F.3d at 509.  Evidence is not material merely because a possibility exists that the evidence may have been beneficial to the defense or may have affected the outcome of the trial.  Id.  Accordingly, Brady "does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit."  Lieberman v. Washington, 128 F.3d 1085, 1092 (7th Cir. 1997).

Here, Petitioner's <u>Brady</u> claims are intertwined with his ineffective assistance of counsel claims, but he seeks to raise a <u>Brady</u> claim independently from the ineffective assistance of counsel claims as well.  Petitioner claims that the Government violated <u>Brady</u> when it failed to acquire and disclose to the defense information regarding Government witness Saman Movassaghi and defense witness Agent David Scharlat.

The Court has already thoroughly explained in a prior order why the Government's failure to produce information about defense witness Agent David Scharlat's misconduct was not a <u>Brady</u> violation.  <u>See</u> d/e 30.  Agent Scharlat was the lead agent investigating the visa fraud and was the agent who supplied the affidavit for the search warrant.  Prior to Petitioner's indictment, Agent Scharlat had been indefinitely suspended for misconduct and was not called as a witness by the Government.  <u>See</u> Crim., Transcript (d/e 75), at 936.  The U.S. Department of State is certainly in possession of investigative files that contain additional information related to the alleged misconduct underlying the state criminal charges brought against Scharlat, and these files would have been useful to the defense for impeachment purposes.

However, these documents are not material to Petitioner's guilt, as the Court would have found Petitioner guilty on Counts 1 through 7 even if the Court had heard evidence regarding the allegations against Scharlat that led to his suspension by the U.S. Department of State.  Although Scharlat, at one time, was the case agent on the investigation into Petitioner's criminal conduct, Scharlat was suspended a year before Petitioner was indicted.  In addition, the Government proved its case against Petitioner at trial without Scharlat's testimony.  Investigative files relating to Scharlat in the possession of the U.S. Department of State or another federal agency are not exculpatory.  Therefore, Petitioner was not entitled to the production of those files under Brady.

Accordingly, only Petitioner's alleged Brady violation regarding information on Government witness Saman Movassaghi remains.  However, as a stand-alone claim, the Government argues that Petitioner's alleged Brady violation is procedurally defaulted.  Generally, constitutional claims that could have been raised on direct review but were not are procedurally defaulted.  See Bousley v. United States, 523 U.S. 614, 621 (1998); McCoy v. United States, 815 F.3d 292, 295 (7th Cir. 2016); Sandoval v. United States, 574

F.3d 847, 850 (7th Cir. 2009).  A constitutional claim that is
procedurally defaulted cannot be raised in collateral review absent a
showing of cause and prejudice or actual innocence.  McCoy, 815
F.3d at 295.  Notably, to show prejudice under the cause and
prejudice standard a petitioner would need to show the same
prejudice that he would need to show to succeed on his Brady claim
anyway.  Accordingly, the focus here is whether cause has been
shown.

Petitioner did not bring his Brady claim on direct review, and,
as this § 2255 Motion alleging his Brady claim was brought prior to
Petitioner withdrawing his direct appeal, he certainly could have
raised the claim.  However, Petitioner does not argue that he had
cause for not raising it on appeal.  Rather, he argues that Brady
claims enjoy the same status as ineffective assistance of counsel
claims do under the Supreme Court's decision in Massaro v. United
States, 538 U.S. 500 (2003).  In Massaro, the Supreme Court held
that a "failure to raise an ineffective-assistance-of-counsel claim on
direct appeal does not bar the claim from being brought in a later,
appropriate proceeding under § 2255."  Massaro, 538 U.S. at 509.
The Supreme Court reasoned that, absent this rule, appellate

counsel would be pressured to bring ineffective assistance of
counsel claims regardless of merit and that even meritorious claims
would be more efficiently addressed in the first instance by the
district court.  Id. at 506.

However, Massero only carved out an exception to the cause
and prejudice rule for ineffective assistance of counsel claims.
Since Massero, district courts in this circuit have continued to
dismiss stand-alone Brady claims for procedural default.  See, e.g.,
United States v. Ledonne, No. 3:14-CR-55 JD, 2021 WL 4263753,
at *7 (N.D. Ind. Sept. 20, 2021) (rejecting Brady claim in a 2255
motion for failing to show cause and prejudice for failure to bring
the claim in his direct appeal); United States v. Bloom, No. 18-CV-
6944, 2019 WL 2601357, at *2 (N.D. Ill. June 25, 2019); (same);
Dixon v. United States, No. 217CV00080JMSDLP, 2018 WL
4077023, at *3 (S.D. Ind. Aug. 27, 2018) (same); United States v.
Townsend, No. 14 C 310, 2015 WL 4656723, at *2 (N.D. Ill. Aug. 5,
2015) (same); United States v. Jones, No. 05 CR 81-2, 2009 WL
3762120, at *4 (N.D. Ill. Nov. 9, 2009) (same).  At least the Ninth
Circuit has recently done so as well.  See United States v. Gibson,
858 F. App'x 211, 212 (9th Cir. 2021), cert. denied, No. 21-7080,

2022 WL 660715 (U.S. Mar. 7, 2022) (finding that if <u>Brady</u> claims were raised on direct appeal they are barred, and, if they were not, they are procedurally defaulted and cause and prejudice must be shown, which the petitioner had failed to do).

While Petitioner has cited cases indicating that <u>Brady</u> claims are often better left to postconviction proceedings, none of these cases suggests that the <u>Brady</u> claims at issue in those cases would not have needed to show cause in order to proceed.  <u>See</u> <u>United States v. Dominguez Benitez</u>, 542 U.S. 74, 83 n.9 (2004) (stating that Brady claims "may be raised in postconviction proceedings such as . . . a motion to vacate a sentence under 28 U.S.C. § 2255" because "[t]hose proceedings permit greater development of the record"); <u>United States v. King</u>, 150 F.3d 644, 651 (7th Cir. 1998) ("At our suggestion, defense counsel requested permission to withdraw the Brady argument in order to preserve it for further development in a motion under 28 U.S.C. § 2255.").

Of course, often <u>Brady</u> claims *cannot* be brought on direct review because the record is undeveloped.  However, it is not just the undeveloped nature of the record that allows the claim to be brought on collateral review.  Rather, when a petitioner can show

that "the factual ... basis for a claim was not reasonably available to counsel," they *have* shown cause for failing to raise the claim. Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986).

Here, the factual basis for Petitioner's Brady claim was available at the time of trial. To support his allegation that materials regarding Movassaghi were withheld, Petitioner points to an email sent between investigators where one investigator states "I'm still interested with Movassaghi, although I haven't been successful with attaching her to this district to pursue possible criminal charges." Ev. Hearing Exhibit 8. However, that document was included in the discovery tendered by the Government prior to trial and DeVooght testified that he was familiar with it. See Transcript (d/e 51) at 128-129. To the extent any additional evidence exists, the reason it is outside of the trial record is because counsel did not raise this potential Brady claim before or during trial. Put another way, the only road to success on Petitioner's Brady claim is by first showing that his counsel was ineffective for not raising the Brady claim at trial. That argument is not procedurally barred and will be addressed below. As a stand-alone claim, however, the Court finds that Petitioner was required to show

Page 21 of 60

cause and prejudice for failing to raise it on direct appeal.  Because

Petitioner has not done so, his stand-alone <u>Brady</u> claim is

dismissed as procedurally defaulted.

## B. Petitioner Has Not Shown His Constitutional Right to Effective Assistance of Counsel Was Violated.

Petitioner's core allegations relate to his Sixth Amendment

right to effective assistance of counsel.  <u>Strickland v. Washington</u>,

466 U.S. 668, 684-86 (1984).  To succeed on an ineffective

assistance of counsel claim, a petitioner must show both that his

attorney's performance was deficient and that he was prejudiced as

a result.  <u>Vinyard v. United States</u>, 804 F.3d 1218, 1225 (7th Cir.

2015).  Courts, however, must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable

professional assistance."  <u>Strickland</u>, 466 U.S. at 690.  A petitioner

must also prove that he has been prejudiced by his counsel's

representation by showing "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would

have been different."  <u>Id</u>. at 694.  Absent a sufficient showing of

both cause and prejudice, a petitioner's claim must fail.  <u>United</u>

<u>States v. Delgado</u>, 936 F.2d 303, 311 (7th Cir. 1991).

Here, Petitioner has alleged ten areas where he claims his counsel provided ineffective assistance, which the Court examines individually below.  As explained below, the Court finds that DeVooght's performance was not constitutionally deficient in any areas and, even if counsel had presented the case as Petitioner now claims counsel should have, Petitioner was not prejudiced by counsel's failure to do so.

1. Counsel's Advice to Plead Guilty to the Misdemeanor Counts:

Petitioner claims his counsel was ineffective when he advised Petitioner to plead guilty to Counts 8 through 10 of the Indictment, the misdemeanor charges for unlawfully employing illegal aliens. Determining whether to advise a client to plead guilty involves defense counsel's "careful strategic choices in balancing opportunities and risks."  See Premo v. Moore, 562 U.S. 115, 124 (2011).  Petitioner's counsel believed that the Court would "value the fact that [Petitioner] plead[ed] guilty to the misdemeanor charges" in Counts 8 through 10.  See Memorandum, Ex. 14.  Trial counsel also thought that Petitioner's refusal to plead guilty to those charges would undercut the defense's credibility, and that

credibility was important to trial counsel, who believed that
Petitioner had a defense to the visa fraud and harboring charges.
Id.

Petitioner argues that his counsel's reasoning was based on a
misunderstanding of the case law.  At the Evidentiary Hearing,
Petitioner called an expert witness who testified that, in his view,
trial counsel's recommendation that Petitioner should plead guilty
to charges 8–10 was not "objectively competent, reasonable advice."
Transcript (d/e 51) at 236.  Petitioner's expert also testified that
trial counsel's strategy appeared to be the result of a "fundamental
mistake" as to the definition of "harboring" in 8 U.S.C.
§ 1324(a)(1)(A)(iii).  Id.

After reviewing Petitioner's evidence, along with the transcripts
from the 2017 trial, the Court does not agree that DeVooght's trial
arguments regarding the definition of "harboring" in
§ 1324(a)(1)(A)(iii) and the application of that definition to
Petitioner's case were the result of careless or incompetent legal
work.  Rather, the Court finds that trial counsel made a perfectly
reasonable, though ultimately unsuccessful, legal argument in an
attempt to distinguish Petitioner's actions from the actions of the

defendants in <u>United States v. McLellan</u>, 794 F.3d 743 (7th Cir.
2015) and <u>United States v. Campbell</u>, 770 F.3d 556 (7th Cir. 2014).
In <u>McLellan</u>, the Seventh Circuit held that harboring requires
"inten[t] to safeguard th[e] alien from the authorities," rather than
"simply providing housing."  794 F.3d at 750–51.  Trial counsel
argued that Petitioner lacked the required intent to safeguard, in
part because there was "no secret" and "no hiding away" of the
aliens whom Petitioner housed.  Crim., Transcript (d/e 70), at 52–
53.  The Court rejected this argument and declined to accept trial
counsel's characterization of the holding in <u>McLellan</u>, but not
because of any egregious or unreasonable mistake on the part of
Petitioner's trial counsel.  DeVooght merely advanced a somewhat
plausible interpretation of the relevant binding precedents that was
favorable to his client.

Petitioner argues that the advice to plead guilty was also
unreasonable because it conceded the *mens rea* element of the
harboring charges (counts 5-7).  Petitioner's contention that trial
counsel ought instead to have argued that Petitioner had no
knowledge that the employees in question were illegal aliens, <u>see</u>
Reply (d/e 59), at 10–11, is precisely the sort of "second-guess[ing]"

of "counsel's assistance after conviction or adverse sentence"
against which <u>Strickland</u> warns.  466 U.S. at 689.  Trial counsel
testified that Petitioner had admitted to counsel that he knew that
the employees were illegal aliens.  Transcript (d/e 51) at 181.  The
Court finds this testimony credible.  As Petitioner alleges in his
reply, counsel still could have argued that the Government had not
met its burden of proof.  However, it is also true that Petitioner's
confession limited the evidence that DeVooght ethically could
present and he was not required to allow Petitioner or other
witnesses to perjure themselves.  <u>See</u> <u>Nix v. Whiteside</u>, 475 U.S.
157, 168, (1986) ("[A]n attorney's ethical duty to advance the
interests of his client is limited by an equally solemn duty to comply
with the law and standards of professional conduct; it specifically
ensures that the client may not use false evidence."); <u>Winston v.
United States</u>, 175 F.3d 1022 at *3 (7th Cir. 1999) (finding that <u>Nix</u>
held that a counsel's refusal "to present evidence to bolster
testimony she believed was false" does not deprive a defendant of
his Sixth Amendment right to counsel); <u>United States v. Henkel</u>,
799 F.2d 369, 370 (7th Cir.1986) (recognizing <u>Nix</u> rule that a
defendant is entitled only to ethical representation and has no right

to have an attorney assist him in presenting false evidence); <u>see also</u> ILCS S. Ct. Rules of Prof. Conduct Rule 3.3 ("A lawyer shall not knowingly . . . make a false statement of fact . . . to a tribunal . . . or . . . offer evidence that the lawyer knows to be false.").

Moreover, there existed ample evidence that Petitioner did know the employees were illegal aliens, of which counsel was well aware.  Counsel testified that he knew of Torres-Hernandez's (one of the individuals Petitioner was charged with illegally hiring and harboring) grand jury testimony that Petitioner had tried to get him a visa but was unsuccessful, Transcript (d/e 51) at 181, and knew of additional testimony that, when an undocumented worker was unable to get back to the United States, Petitioner had paid money to have him smuggled back into the United States.  <u>Id</u>. at 182.  On this record, nothing suggests that counsel's advice was unreasonable or otherwise constitutionally deficient.  Accordingly, the Court finds that Petitioner's plea was not the result of ineffective assistance of counsel.

2. <u>Counsel's Advice to Waive Petitioner's Jury Trial Right:</u>

Petitioner claims his counsel was ineffective when he advised Petitioner to waive his right to a jury trial.  As a preliminary matter,

trial counsel's decision to advise Petitioner to waive Petitioner's right to jury trial was a strategic choice.  See, e.g., Milone v. Camp, 22 F.3d 693, 705 (7th Cir. 1994) (holding that recommendation to waive jury trial was a "trial strategy").  Petitioner does not dispute this, and instead attempts to rebut the presumption of competence by offering evidence of the unreasonableness of trial counsel's strategic decision.  See Reply (d/e 59), at 18–19.  Petitioner argues that DeVooght advised Petitioner to waive his right to trial by jury in a forceful, "one-sided," and "pushing" manner and that this action made trial counsel constitutionally ineffective.  See id. at 17–18.  At the Evidentiary Hearing, Petitioner attempted to corroborate this claim by calling an expert witness, who testified that in his professional opinion Petitioner's trial counsel had not provided advice and information adequate to allow Petitioner to make an informed decision about whether to waive his right to jury trial.  See Transcript (d/e 51) at 225–26.

The record shows that DeVooght believed that a bench trial would likely result in a more favorable verdict than a jury trial and that this belief was based on considerations such as the ability of a judge to understand complicated legal arguments that might

confuse a jury, the possibility that a jury would be unsympathetic towards Petitioner due to the nature of his offenses, and DeVooght's subjective evaluation of the likelihood that the specific judge assigned to Petitioner's case would issue a favorable verdict. See Transcript (d/e 51), at 95–96, 99, 112–13, 183–85, and 250–52; see also Montgomery v. Uchtman, 426 F.3d 905, 913–14 (7th Cir. 2005) (finding effective assistance of counsel where advice to waive jury right was based on reasonable belief that jury would be unsympathetic, or that judge would be less likely to impose the death penalty than a jury). Furthermore, trial counsel explained the reasoning behind his recommendation to Petitioner in an e-mail, as well as in at least one in-person conversation. See Memo (d/e 2), at Exh. 14; Transcript (d/e 51) at 91–92. The Court finds that counsel's evaluation was not unreasonable. The fact that trial counsel referred to the choice of bench trial as a "no-brainer" and did not devote equal space in his e-mail to the advantages of a jury trial is not enough to overcome the strong presumption that trial counsel acted reasonably. Accordingly, the Court finds that counsel's conduct was not deficient when he advised Petitioner to waive his jury trial right.

3. <u>Counsel's Failure to Advise Petitioner to Cooperate:</u>

Petitioner argues that DeVooght was incompetent because he failed to advise Petitioner about possible cooperation with the Government in its investigation of Daley, Lombardi, and/or Movassaghi.  The Court finds this claim is without merit. Defense counsel may have an obligation to communicate with the Government regarding a defendant's willingness to cooperate.  <u>See, e.g.,</u> <u>United States v. Delgado</u>, 936 F.2d 303, 312 (7th Cir. 1991) (finding no prejudice where petitioner alleged defense counsel failed to fully communicate with the Government regarding defendant's willingness to cooperate), *abrogated on other grounds by* <u>United States v. Thompson</u>, 944 F.2d 1331 (7th Cir. 1991).

However, at the evidentiary hearing DeVooght testified that he "absolutely" discussed with the Petitioner the possibility of cooperating with the Government.  Transcript (d/e 51) at 186. DeVooght testified that Petitioner told him, "I don't know nothing." <u>Id.</u> at 187.  DeVooght told Petitioner that the United States believed he was protecting Lombardi and Daley.  <u>Id.</u>  The entire time that DeVooght represented Petitioner, he never told DeVooght that he had knowledge of any criminal activity of Lombardi, Daley, or

Movassaghi.  Id. at 187-88.  The Court finds DeVooght's testimony credible.  Therefore, Petitioner has not shown counsel's performance was deficient because counsel did advise Petitioner about the potential for cooperation.

Moreover, the Court notes that Petitioner has maintained his innocence throughout these collateral proceedings, even of the counts to which he pled guilty.  It is unclear what assistance he believed he would have been able to provide to the Government under a cooperation agreement.  Accordingly, the Court finds Petitioner has failed to show any prejudice.

4. Counsel's Advice to Waive Attorney-Client Privilege:

Petitioner alleges that his attorney should not have advised him to waive his attorney-client privilege with regards to his immigration attorney, Movassaghi.  While the Seventh Circuit has not provided clear guidance on when a waiver of attorney-client privilege is a matter of strategy, the Ninth Circuit has held that such advice can be strategic in nature.  See Aguilar v. Alexander, 125 F.3d 815, 819 (9th Cir. 2007) ("To the extent that counsel urged the waiver [of attorney-client privilege] to preserve [the defendant's] opportunity to testify, that decision constituted a trial

strategy and not deficient performance.").  According to Petitioner,

during the course of the Government's investigation, trial counsel

advised Petitioner to waive attorney-client privilege with the

immigration attorney, Movassaghi, believing that Petitioner's refusal

to do so would likely result in Petitioner being indicted.

Memorandum (d/e 2), Ex. 22, ¶ 5.  At the evidentiary hearing,

DeVooght did not remember using "those words" but confirmed that

he told Petitioner the "Government wasn't gonna go away," that they

"would think it odd that we made this decision to [speak with

them]" and then not waive privilege, and that it would "look bad" to

not waive privilege.  Transcript (d/e 51) at 70-72; see also, Memo

(d/e 2), at Exh. 11 (2015 e-mail in which trial counsel informs

AUSA that Petitioner waived attorney-client privilege on phone call

with Movassaghi because Petitioner has "nothing to hide.").  The

Court finds counsel's stated reasons credible and represented a

reasonable strategy.

Still, Petitioner argues that waiving the privilege without at

least talking to Movassaghi was an error.  DeVooght testified that

when he spoke with Petitioner he repeatedly emphasized his rule of

"do no harm" and warned him that "if there's something I need to

know, he needs to tell me." <u>See</u> Transcript (d/e 51) at 73.

DeVooght testified that he spoke to Petitioner regarding the

potential harm of waiving the attorney-client privilege.  <u>Id.</u>

Petitioner confirmed at the evidentiary hearing that he did not

inform DeVooght about any past communications with Movassaghi

that could be a problem.  <u>See</u> Transcript (d/e 52) at 305.

Petitioner's argument, in part, appears to be that DeVooght should

not have trusted Petitioner.  While DeVooght could have been more

skeptical of his client and chosen to speak with Movassaghi, the

Court cannot find that it was an unreasonable strategy for

DeVooght to trust his client and proceed with a strategy of

distancing Petitioner from those he was trying to convince the

Government had been the ones committing the fraud.  Accordingly,

the Court does not find that DeVooght's conduct was deficient

based on his failure to speak with Movassaghi prior to advising a

waiver of attorney-client privilege.

Moreover, at the evidentiary hearing, Petitioner conceded that

he did in fact agree to waive attorney-client privilege, although he

asserts that he was "pressured" by trial counsel's insistence that he

would be indicted if he refused to sign the waiver.  <u>Id</u>. at 297, 314.

Accordingly, the Court finds that Petitioner consented to the waiver of attorney-client privilege.  See Ganaway v. United States, 69 F.3d 539 (7th Cir. 1995) ("[W]here defendant agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel").  Not only did Petitioner fail to tell his counsel that there could be problematic emails in Petitioner's communications with Movassaghi, he affirmatively consented to the strategy of waiving attorney-client privilege.  The Court finds that Petitioner's consent to that strategy further bars his attempt to raise the waiver of his attorney-client privilege with Movassaghi as a ground of ineffective assistance of counsel now.

The Government also argues that there was no prejudice because the evidence would have been discoverable absent a wavier due to the crime-fraud exception.  "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the `seal of secrecy,' between lawyer and client does not extend to communications `made for the purpose of getting advice for the commission of a fraud' or crime."  United States v. Zolin, 491 U.S. 554, 563 (1989) (citations omitted).  In the Seventh Circuit, the prosecution may seek and obtain in camera review of

communications otherwise protected by the attorney-client privilege
if there exists "enough evidence to support a 'good faith belief by a
reasonable person' that such review may reveal evidence
establishing the exception." United States v. Boender, 649 F.3d
650, 656 (7th Cir. 2011) (citing Zolin, 491 U.S. at 572).  Here, the
parties do not dispute that a fraud has been committed: the
contracts attached to the visa petitions were fabricated, the
petitions and contracts that at least purported to be signed by
Petitioner sought workers for his business, and they were filed
through the assistance of Movassaghi.  Notably, at the time
DeVooght advised Petitioner to waive privilege, the search warrant
on Petitioner's warehouse had already been completed.  During the
search, law enforcement found copies and/or drafts of the petitions
and contracts that had been filed with DHS and notices regarding
those petitions.  See, e.g., Transcript (d/e 71) at 166-171, 174-175.
These facts alone would have been enough evidence to support a
"good faith belief by a reasonable person" that the crime-fraud
exception applied such that an *in camera* review of the attorney-
client communications between Petitioner and Movassaghi was
authorized pursuant to Zolin and Boender.  Accordingly, the Court

also finds DeVooght's advice to waive attorney-client privilege did not result in any prejudice even if it were deficient advice.

   5. Counsel's Failure to File a Motion to Suppress:

   Petitioner argues that counsel should have filed a motion to suppress the evidence seized pursuant to the search warrant of Petitioner's warehouse.  To succeed on an argument that defense counsel's failure to file a motion to suppress was ineffective assistance of counsel, a petitioner must show that "there was both a reasonable probability that he would have prevailed on the motion to suppress and a reasonable probability that, if [the evidence] were suppressed, he would have been acquitted."  Bynum v. Lemmon, 560 F.3d 678, 685 (7th Cir. 2009) (citing Strickland, 466 U.S. at 694); Hicks v. Hepp, 871 F.3d 513, 526 (7th Cir. 2017).

   Here, Petitioner argues that the search did not satisfy the Fourth Amendment's particularity requirement.  The Fourth Amendment to the United States Constitution provides, in relevant part, "[n]o warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "[A]uthorization to search [the entire premises] for evidence of any crime flunks the

particularity requirement." <u>United States v. Sanchez-Jara</u>, 889 F.3d 418, 421 (7th Cir. 2018).  "Warrants that fail to satisfy this threshold requirement are facially deficient, and executing officers may not rely on them." <u>Archer v. Chisholm</u>, 870 F.3d 603, 616 (7th Cir. 2017).

On May 22, 2014, United States Magistrate Judge David G. Bernthal issued the warrant to search the Gire warehouse. Petitioner argues that the search warrant should have been limited to only evidence of visa fraud.  However, Attachment B to the warrant contained a list of "items to be seized" that included "[a]ny and all records related to foreign workers." <u>See</u> Memo. (d/e 2), Ex. 17, May 2014 Warrant and Attachments at 3.  The warrant also allowed seizure of documents that Petitioner claims were unrelated to foreign workers at all, including "[a]ll shredded documents and trash, which may contain additional evidence of criminal activity," and "[a]ny and all cellular telephones owned or used in connection with the business of Grayson Enterprises, Gire Construction, Gire Roofing, or any related entity." <u>Id</u>.

The Court does not agree that the warrant violated the particularity requirment.  Listing only "evidence of crime" as a

description of the things to be seized does not satisfy the Fourth Amendment's particularity requirement and "can only be described as a general warrant." United States v. Stefonek, 179 F.3d 1030, 1033 (7th Cir. 1999).  However, the warrant here was far more specific than the warrant in Stefonek, as it listed the specific types of items which law enforcement believed would have evidence of the crime of visa fraud.  Petitioner does not argue that law enforcement did not have probable cause to conduct the search or to seize the items listed.  And, evidence of foreign workers logically relates to the visa fraud crime that law enforcement had probable cause to believe Petitioner had committed.

Additionally, suppression of the evidence is not warranted where the alleged error did not cause the harm the policy against general warrants was meant to prevent: to "make sure that a search pursuant to a warrant does not invade the property and privacy of the individual whose premises are to be searched, and property seized, beyond what is necessary to achieve a valid law enforcement purpose as determined by a judicial officer." United States v. Stefonek, 179 F.3d 1030, 1033 (7th Cir. 1999).  Petitioner does not

challenge the finding that there was probable cause to conduct the search.

Moreover, the Court does not agree with Petitioner's argument that the search extended beyond what probable cause allowed because law enforcement seized an I-Pad, three computers, boxes of miscellaneous documents and papers, various personal identification documents, and a DVR system.  While the search was broad, "[c]riminals don't advertise where they keep evidence." United States v. Bishop, 910 F.3d 335, 337 (7th Cir. 2018), cert. denied, 139 S. Ct. 1590 (2019).  Accordingly, "a warrant authorizing a search for documents that will prove a crime may authorize a search of every document the suspect has, because any of them might supply evidence."  Id.  "It is enough . . .if the warrant cabins the things being looked for by stating what crime is under investigation."  United States v. Bishop, 910 F.3d 335, 337 (7th Cir. 2018).  In light of Bishop, the Court finds that the search, as authorized and as conducted, was justified by probable cause.

Petitioner also argues that the law enforcement officers seized items related to harboring, whereas the affidavit only contained probable cause to search for visa fraud.  However, the items seized

were not outside the scope of the warrant and Petitioner has not so argued.  Law enforcement is not required to ignore evidence of another crime that is discovered when conducting an authorized search.  Moreover, with regard to the DVR, the agents prudently sought an additional warrant before conducting a search of the digital files.  See United States v. Lickers, 928 F.3d 609, 619 (7th Cir. 2019), cert. denied, No. 19-5795, 2019 WL 5150671 (U.S. Oct. 15, 2019) (holding that the application for, and execution of, the federal search warrant reflected good faith on the part of the federal agents).  Accordingly, Petitioner has not shown that he would have succeeded on a motion to suppress.

Petitioner also argues that counsel should have moved for a hearing under Franks v. Delaware, 438 U.S.C 154 (1978) because the affiant, Agent Scharlat, failed to disclose his alleged misconduct.  However, DeVooght testified that he was not aware of any sexual assault allegations against the search warrant affiant until after the trial.  See Transcript (d/e 51) at 186.  Moreover, while Scharlat's misconduct certainly goes to his character, Petitioner has not articulated how it would have undermined the

credibility of the investigation or the existence of probable cause in this case.

Because Petitioner has not shown that he would have succeeded on his motion to suppress, he has not shown that counsel was deficient or that he suffered any prejudice.  See also, Resnick v. United States, 7 F.4th 611, 622 (7th Cir. 2021) ("As we have held, counsel does not need to raise meritless arguments") (citing Long v. United States, 847 F.3d 916, 920 (7th Cir. 2017)).

Additionally, at the evidentiary hearing, DeVooght testified that he considered filing a motion to suppress and discussed such a motion with Petitioner, but counsel concluded that "it would be a lot of effort for a very little probability of success.  And that we had other issues that we had to really focus on."  See Transcript (d/e 51) at 186.  Even if Petitioner had raised a potentially meritorious issue, the Court credits DeVooght's testimony that he made a strategic decision not to pursue a motion that had little probability of success.  Accordingly, Petitioner's claim of ineffective assistance based on counsel's failure to file a motion to suppress is denied.

6. <u>Counsel's Failure to Retain a Handwriting Expert:</u>

Petitioner argues that his counsel should have retained a handwriting expert. Whether to retain an expert at trial whose testimony could have either supported or contradicted a defendant's defense is also a matter of strategy. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 108 (2011) ("Even if it had been apparent that expert blood testimony could support [defendant's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it."). Petitioner claims that trial counsel did not retain a handwriting expert despite Petitioner stating that the signatures on the visa applications in question were not Petitioner's. <u>See</u> Memo (d/e 2), Ex. 22, ¶ 8. Petitioner claims that trial counsel decided not to retain such an expert because the burden was on the Government to prove the signatures were Petitioner's. <u>Id</u>.

Current counsel for the Petitioner examined DeVooght at the Evidentiary Hearing, and DeVooght explained his decision not to call a handwriting expert. He testified that the decision was the result of extensive consultation with Petitioner and Young and was made for strategic reasons, including the possibility that such an

action would lead the Government to hire a handwriting expert of its own.  See Transcript (d/e 51), at 87–88.

At the evidentiary hearing, John Breslin testified as a handwriting expert, but had not reviewed original copies of the relevant visa petitions at the time.  After the evidentiary hearing, the parties filed a stipulation regarding additional testimony of Breslin after he had the opportunity to review the original 2014 visa petition.  See Stipulation (d/e 63).  Based on that review, Breslin would now testify, to a reasonable degree of professional certainty, that the signature on the original 2014 I-129 visa petition was not Petitioner's.  Id.  However, Breslin did not give an opinion as to who may have signed the petition.

Notably, as the Government highlights, at trial, the Government presented an email dated March 13, 2013, that Young wrote to Movassaghi stating: "I won't be able to get [the petitioner's] signature until tonight.  Would it be okay for me to sign it since I'm the owner?"  Crim., Transcript (d/e 75) at 1011-12; Gov. Ex. 302 at 95- 97.  See also Crim., Transcript (d/e 70, 75, 76) at 119-20, 970, 977, 1091; Crim., (d/e 119-1), Ex. A; Crim., Gov. Ex. 300 at 71; Gov. Ex. 300 at 134-35.  Accordingly, the Government argues that

even with the testimony of the handwriting expert, the evidence still establishes that Petitioner either signed the fraudulent petitions or authorized Young to do so on his behalf.  See also, 18 U.S.C. § 2 ("(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

This Court finds that trial counsel's strategic decision not to call a handwriting expert was not so objectively unreasonable as to deprive Petitioner of constitutionally effective assistance of counsel. See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").  Petitioner's counsel did not know that an expert would find that the signature on the March 2013 petition was not Petitioner's at the time of trial, and reasons to be believe that the testimony of a handwriting expert overall may not be helpful.  Moreover, given the evidence at trial regarding Young's authorization to sign the petition, the Court does not find that Petitioner has proven prejudice either.

7. <u>Counsel's Failure to Interview Additional Potential</u>

   <u>Witnesses and Sufficiently Investigate the Guilt of Others</u>:

Petitioner claims that his counsel was ineffective for failing to sufficiently investigate the responsibility of others he claims are responsible for the visa fraud.  Prior to indictment, at trial, and now, Petitioner has claimed that he is innocent of the visa fraud charges and theorizes that the fraud was perpetrated instead by others, including Lombardi, Daley, and/or Movassaghi.  Despite presenting evidence supporting this defense at trial, Petitioner claims his attorney did not do enough to investigate and present all evidence that may have implicated these individuals in the fraud. Petitioner claims that DeVooght should have: (1) interviewed Daley, Lombardi, and Movassaghi; (2) had Daley and Lombardi testify at trial; (3) moved to admit portions of Daley's grand jury testimony; (4) presented evidence from additional associates of Daley and Lombardi; (5) located, interviewed, subpoenaed, or sought to depose the workers subject to the relevant visa petitions; and (6) elicited testimony about the Government's investigation of Daley.  Memo (d/e 2) at 6-12, 16-17.

Trial counsel has a duty to investigate that requires counsel to either "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674 (1984).  While, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable [,] . . . strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 691.  "The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness."  Mosley v. Atchison, 689 F.3d 838, 848 (7th Cir. 2012) (noting the deferential presumption in that strategic decisions are reasonable "applies only if the lawyer actually exercised judgment.").

Petitioner argues that DeVooght should have interviewed Movassaghi, Lombardi, and Daley.  At the evidentiary hearing DeVooght testified that he, along with Petitioner and Young, made a collective strategic decision not to interview Lombardi, Daley, or Movassaghi before trial because they did not believe a discussion

with them would be credible or fruitful.  Transcript (d/e 51) at 80.

This decision was based on the information he received from

Petitioner and Young, as well as discovery received from the United

States.  Id. at 81.  Their strategy was to distance Petitioner from

Lombardi, Daley, and Movassaghi and then to put Lombardi, Daley,

and Movassaghi on trial.  Transcript (d/e 51) at 81-83.  DeVooght

also did not want to call them as defense witnesses because "we did

not want our case to look like it was dependent on anything these

people had to say."  Transcript (d/e 51) at 171-72.

       However, Petitioner argues that DeVooght could not have

exercised any reasonable strategy because he did not know what

their testimony could be.  Petitioner points to the Seventh Circuit's

decision in Mosley, in which counsel had failed to investigate the

potential testimony of alibi witnesses.  See Mosley, 689 F.3d at 848

("If [counsel] never found out what [the potential witnesses']

testimony would be, he could not possibly have made a reasonable

professional judgment that their testimony would have been

cumulative or bolstered the State's case and could not have chosen

not to call [the witnesses] as a matter of strategy.").  However,

unlike the alibi witnesses in Mosley, given Petitioner's defense

theory, interviewing Lombardi, Daley, and Movassaghi would only have resulted in exonerating evidence to the extent that they implicated *themselves* in the crime. DeVooght and Petitioner agreed on a trial strategy of putting these three individuals on trial. It was not unreasonable for DeVooght to conclude that speaking with these individuals prior to trial would not be credible or fruitful.

Nor was it unreasonable not to subpoena Daley or to try and get his grand jury testimony admitted at trial. As the trial record shows, the United States had issued a subpoena for Daley. They were unable to secure his appearance because, according to his local counsel, he was in a Mexican hospital. Transcript (d/e 51) at 147. While Petitioner argues that counsel should have moved to admit Daley's grand jury testimony, counsel testified that he believed the positives of Daley's grand jury testimony were outweighed by the negatives. Transcript (d/e 51) at 149, 173 (noting that Daley's grand jury testimony was that "Fatima" did not exist). If DeVooght sought to and successfully admitted Daley's grand jury testimony, this would have allowed the Court to review the entire transcript. See Fed. R. Evid. 106 (doctrine of completeness). Moreover, counsel testified that some of the positive

Page 48 of 60

facts from his testimony had already been elicited from other

witnesses.  Transcript (d/e 51) at 149.  For instance, counsel noted

that the "idea that [Daley] had multiple women that worked for him

in the paperwork" had already been elicited from Agent Scharlat.

Id.  Accordingly, the Court finds that DeVooght made a reasonable

strategic decision, and was not deficient for failing to get Daley's

grand jury testimony admitted.

Petitioner also argues that counsel should have presented

evidence from additional associates of Daley and Lombardi.

Specifically, he mentions that counsel declined to present evidence

from Lombardi's former business partner Bia Molina.  Molina had

previously accused Lombardi of misconduct, including misleading

customers, "agreeing not to charge fees, and collecting those

anyways," and "misrepresent[ing] [their] customers in the I-129

forms submitted to USCIS on their behalf."  Memo (d/e 2) at 11.

However, at the evidentiary hearing, DeVooght testified that he did

speak with Molina and "made the conscious strategic decision not

to put someone on the stand who could take on some water for

their clear bias."  Transcript (d/e 51) at 153.  Further, DeVooght

thought that the testimony of Agent Elder, Nina Navis, and Michael

Dominguez covered the same points counsel could make with Bias's testimony without the bias issue.  Id.  Accordingly, again, the Court finds that DeVooght made a reasonable strategic decision not to put Molina on the stand.

Petitioner next alleges that counsel's investigation was deficient because he neglected to locate, interview, subpoena, or seek to depose workers subject to the relevant visa petitions. Petitioner has failed to develop this argument and provide any evidence of what the workers would have testified to that was not already in the record nor has he shown how such testimony would have impacted the outcome of the trial.  Accordingly, the Court does not find that this is a colorable allegation of ineffective assistance of counsel.

Finally, the Court notes that Petitioner's claim involving DeVooght's failure to investigate and acquire exculpatory evidence also criticizes DeVooght for not subpoenaing certain records relating to Movassaghi, Daley, Lombardi, and an e-mail account (girehumanresrces@yahoo.com), and not thoroughly searching for companies or their owners who had dealings with Daley, Lombardi, and/or Movassaghi.  See Memo (d/e 2) at 12- 16.  The failure to

obtain this exculpatory evidence was thoroughly addressed in the Court's Order on Petitioner's Motion for Discovery of these same documents.  See Order (d/e 30).  As part of that motion, Petitioner sought to subpoena: (1) e-mails or other documents from Daley, Lombardi, and Molina relating to their involvement with work visa applications for Gire Construction or any other client; (2) 2011 records from Movassaghi's e-mail service provider; (3) phone records associated with Daley's known phone numbers; (4) Movassaghi's phone records and bank records; and (5) records relating to an e-mail address (girehumanresrces@yahoo.com). Motion (d/e 11), at 10.  However, Petitioner failed to show that any of this information would have been useful for his case or that some of these records even existed.  Accordingly, the Court held that the bulk of Petitioner's subpoena requests represented a fishing expedition.  See Order (d/e 30) at 10.  On the merits now, the Court finds that these speculative arguments regarding what trial counsel could have investigated are insufficient to show ineffective assistance of counsel.

With regard to DeVooght's failure to conduct an investigation into the origins of the girehumanresources@yahoo.com e-mail

address, the Court already found that Petitioner has not shown how this evidence would have supported his defense.  Petitioner claims that he did not create or use the e-mail account and that he informed DeVooght of messages to and from the account, some of which were electronically signed "Ed Gire."  Gire Aff. (d/e 2-22), ¶ 14.  However, Petitioner does not explain how he came to learn of the girehumanresrces@yahoo.com e-mail account and in no way connects this account to Lombardi, Daley, Movassaghi, or any other person.  Nor does Petitioner claim that the July 2013 e-mail possibly sent from Mexico relates to any of the visa petitions underlying Petitioner's visa fraud convictions or that the email is signed "Ed Gire."  Further, the fact that an e-mail was sent from Mexico does not definitively prove that the e-mail was not sent by Petitioner or someone authorized by Petitioner to send the e-mail. Petitioner admits that the Government did not use any emails to or from the girehumanresrces@yahoo.com account against Petitioner at trial.  See Reply (d/e 20), at 19.  Moreover, as DeVooght pointed out at the evidentiary hearing, Petitioner's known and active work e-mail was copied on every e-mail sent to or from this account. Transcript (d/e 51) at 190.  Therefore, DeVooght felt it was a better

strategy to cross-examine Special Agent Dan Mancini about his lack
of knowledge or investigation of that account.  Id. at 191.
Accordingly, the Court finds that trial counsel made a reasonable
strategic decision not to conduct a further investigation into the
origins of this email address and that Petitioner has not shown any
prejudice from the failure to do so.  In summary, the Court finds
that Petitioner has not shown any instance of deficient conduct
related to trial counsel's investigation.

    8. Counsel's Failure to Request Investigative Files:

    Petitioner claims that trial counsel was incompetent for failing
to request investigative files regarding Movassaghi and Agent
Sharlart.  These claims relate to Petitioner's Brady claims discussed
above.  However, as explained above and in the Court's prior order,
d/e 30, the Government was not required to turn over any
investigative files regarding Agent Sharlart, who was called only as
a defense witness.  These files would have been useful for
impeachment value only and were not required to be turned over by
the Government.  Moreover, because the Court has found that the
investigative files regarding Agent Sharlart would not have changed
the result at trial, the Court finds that Petitioner was not prejudiced

by trial counsel's failure to request the files or to further inquire into Agent Sharlart's misconduct when Agent Sharlart was testifying.

And, regardless of whether trial counsel should have requested any investigative files of Movassaghi, Petitioner has not shown that such files exist so Petitioner could not have suffered any prejudice for this alleged failure.  In a status conference on October 14, 2020, the Court granted leave to depose Agent Pham regarding his emails in which he indicated he was "interested" in Movassaghi.  See Hearing Exhibit 8; Hearing Exhibit 9.  No further testimony or evidence regarding this issue has been submitted to the Court, so the Court presumes that Agent Pham's testimony did not provide support for Petitioner belief that files existed.

Nonetheless, in complying with the Court's discovery order, the Government did turn over another fraudulent visa petition that had been submitted by Movassaghi that related to the prior investigation and prosecution of Lombardi.  This petition, filed for Aramark, was found in the possession of the Department of Homeland Security ("DHS"), an agency that participated in the prosecution of Petitioner.  See Notice (d/e 34); Hearing Exhibit 34.

Petitioner argues that the Aramark petition is exculpatory. However, only Lombardi was criminally charged with the fraud related to the Aramark petition, not Movassaghi.  And, at trial, it was known that Movassaghi worked with Lombardi and submitted a number of petitions in connection with him.  See Crim., Transcript (d/e 73) at 525.  Notably, DeVooght did introduce similar evidence.  For example, Teri Borowski who worked for the Polo Club of Boca Raton testified that Lombardi charged his workers illegal fees and that his signature was forged on a visa related document. See, e.g., Crim., Transcript (d/e 74) at 743-51.  Petitioner does not explain what impact another such instance would have made.  Nor would it be particularly surprising that there would be other petitions that Movassaghi submitted that were later found to be associated with Lombardi's fraud.  Moreover, Petitioner has not explained how this document is exculpatory or how its failure to be requested and discovered by trial counsel would have impacted the outcome of the trial.  Accordingly, the Court finds that Petitioner has failed to show ineffective assistance of counsel for counsel's failure to request investigative files and related documents for either Agent Scharlat or Movassaghi.

9. Counsel's Alleged Failure to Prepare Ms. Young to Testify:

Petitioner next claims that trial counsel was ineffective because he failed to prepare Young to testify. This claim requires little discussion. At the evidentiary hearing, DeVooght testified that he did prepare her to testify. Transcript (d/e 51) at 144, 189. Petitioner did not present any evidence to the contrary, and the Court finds DeVooght's testimony credible. This claim is denied.

10.   Counsel's Failure to Raise Certain Objections at Trial:

Finally, Petitioner argues that counsel failed to raise certain objections at trial. However, as the Government highlights, this was a bench trial and the law presumes that judges are not influenced by improper evidence bought before them in rendering a verdict. See, e.g., United States v. Lim, 57 F. App'x 701, 704 (7th Cir. 2003) (rejecting evidentiary claim, which is "inapposite in a bench trial, where there is no risk of jury prejudice"); United States v. Shukri, 207 F.3d 412, 419 (7th Cir. 2000) ("In a bench trial, we assume that the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary."); Ashford v. Gilmore, 167 F.3d 1130, 1136 (7th Cir. 1999) ("[T]he law presumes that judges are not influenced by improper

evidence brought before them.); United States ex rel. Placek v.
Illinois, 546 F.2d 1298, 1305 (7th Cir. 1976)("[W]hen we have held
that evidence was improperly admitted in a bench trial, we have
refused to presume that the trial judge considered it in reaching his
verdict.") (citing United States v. Stanley, 411 F.2d 514, 516 (7th
Cir. 1969); United States v. Menk, 406 F.2d 124, 127 (7th Cir.
1969)); Martin v. F.E. Moran, Inc., 2017 WL 1105388, at *4 (N.D.
Ill. Mar. 24, 2017) ("[T]here is a presumption that the court is not
improperly influenced by the evidence brought before it").  Petitioner
has not presented any evidence to rebut this presumption or
otherwise responded to this caselaw in his reply.  Accordingly, the
Court finds that this claim must be denied.

*****

While the Court finds that none of the alleged errors qualified
as deficient conduct, the Court also notes that, even had counsel
conducted his investigation and trial strategy in the manner
Petitioner now alleges he should have, Petitioner has not shown
that the result would have been different.  The Government
presented overwhelming evidence of guilt at trial.  Notably, the
Government presented a theory that Petitioner had learned about

this type of visa fraud scheme from Lombardi and Daley and knowingly participated with them in the scheme.  Accordingly, even if Petitioner had uncovered and presented additional evidence regarding Lombardi and/or Daley's involvement in the fraudulent scheme, Petitioner has not shown that this evidence would be exculpatory or otherwise inconsistent with him also being guilty. Because Petitioner has not shown that counsel's conduct was deficient or that he was prejudiced by the alleged errors, the Court must deny his claim of ineffective assistance of counsel.

## IV. CERTIFICATE OF APPEALABILITY

If Petitioner seeks to appeal this decision, he must first obtain a certificate of appealability.  See 28 U.S.C. § 2253(c) (providing that an appeal may not be taken to the court of appeals from the final order in a § 2255 proceeding unless a circuit justice or judge issues a certificate of appealability).  A certificate of appealability may issue only if Petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Such a showing is made if "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner."  Slack v. McDaniel, 529 U.S. 473, 484, 120

S. Ct. 1595 (2000).  When a federal habeas petition is dismissed on procedural grounds without reaching the underlying constitutional claim, the movant must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Id.  In light of the Court's factual findings, including the Court's finding that DeVooght's testimony at the evidentiary hearing was credible, the Court does not find that reasonable jurists could disagree with the Court's findings that Petitioner did not receive ineffective assistance of counsel or that Petitioner's stand-alone Brady claim is procedurally defaulted.  Accordingly, the Court declines to issue a certificate of appealability.

## V.  CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (d/e 1).  The Court DECLINES to issue a Certificate of Appealability.  Petitioner's Motion for a Status Conference (d/e 65) is DENIED as moot.  This case is CLOSED.  The Clerk is DIRECTED to prepare the Judgment.

Signed on this 29th day of March 2022.

<u>/s/ Sue E. Myerscough</u>
Sue E. Myerscough
United States District Judge